T. R. FENTON, Appellee, v. H. C. MILLER, Appellant.

**Brokers:**  SALE OF LAND ON COMMISSION:  COMPENSATION:  EVIDENCE.
1  A broker authorized to find a purchaser for land need only show that he was the efficient and procuring cause of the sale, and that it was through his efforts that the sale was finally consummated; and even though the land may have been listed with another agent who first endeavored to sell it to the same purchaser he is not required to show an abandonment of the negotiations by that agent.

**Same:**  EFFICIENT AND PROCURING CAUSE:  EVIDENCE.  Ordinarily the
2  question of whether a broker's efforts were the efficient and procuring cause of a sale, or which of two or more brokers with whom the land was listed in fact induced the sale, is for the jury. In this case the evidence is held sufficient to support a verdict for plaintiff, although another agent had the land listed and had first seen the purchaser about buying it.

**Same:**  COMPENSATION:  CONFLICTING CLAIMS.  Where land is listed
3  for sale with different agents and each is claiming the compensation, the owner, to protect himself, should pay neither until the right thereto has been judicially determined, otherwise he may have to pay both.
Weaver and Evans, JJ., dissenting.

*Appeal from Cherokee District Court.*—HON. JOHN F. OLIVER, Judge.

THURSDAY, JANUARY 18, 1912.

ACTION to recover a commission for the sale of real estate. Defendant denied that plaintiff was the procuring cause of the sale. On these issues the case was tried to a jury, resulting in a verdict and judgment for plaintiff, and defendant appeals.—*Affirmed.*

*B. Radcliffe* and *Herrick & Herrick,* for appellant.

*Molyneux & Maher,* for appellee.

DEEMER, J.—Plaintiff claims that on or about the 15th day of September, 1908, he and the defendant herein entered into an oral agreement, whereby the plaintiff was to exercise his skill in porcuring for the defendant a purchaser of his farm, and if the farm was sold as a result of the plaintiff's efforts in procuring, sending to, or bringing to the defendant a purchaser for his farm, then the plaintiff, T. R. Fenton, was to have and receive from the defendant as his compensation, the sum of $1 an acre for each acre so sold. Immediately, plaintiff put forth every effort in seeking a purchaser, and after a diligent search his efforts were finally rewarded and the farm sold to one D. M. Lorenzen.

The testimony shows that defendant listed his farm with the plaintiff for sale, but at the time refused to give him an exclusive agency, notifying him that he had already listed the land with another agent named Barnes. One Lorenzen was also the owner of a farm in Cherokee county, which he had listed with the plaintiff for sale; but this listing was conditioned upon Lorenzen's being able to purchase another farm. At the time the defendant listed

his land with plaintiff, he (plaintiff) said to defendant: "I will keep the numbers of your land here and your price as you gave it to me and keep it on my list, but I won't do as much work on your farm as I would if I had an exclusive contract, and if at any time I run across a purchaser for your farm and it is not sold, I will go down and see you and see if we can make a deal. Miller said this would be all right, and that he would allow $1 per acre in case Fenton would bring or furnish him a buyer on any terms and price satisfactory to Miller."

In order to induce Lorenzen to sell, plaintiff tried to interest him in other lands, and, after showing him a tract, Lorenzen spoke about defendant's farm, saying that he had seen it advertised for sale in a newspaper by Barnes; that he had spoken to Barnes about it and had been down to see it, but that Miller, the defendant, was not at home; that later he went over the farm with defendant and then saw Barnes and had a talk with him about the matter before anything was said by him to plaintiff or by plaintiff to him about the property. Later Lorenzen again saw plaintiff and urged him to sell his farm, as he wanted more land, but at all times asserted that he would not sell unless he was assured of another farm. Plaintiff then sent his brother with Lorenzen to look at defendant's farm, but defendant was not at home, and later plaintiff and Lorenzen went to see defendant, took dinner with him, and talked over the sale. Some talk was had about the price, and defendant said he would not take less than $100 per acre. No conclusion was reached on that day, but defendant said he would come up next day and try to close the deal; that if Lorenzen would take his land at the price fixed, terms could be agreed upon. On this next day plaintiff sold the Lorenzen farm, but before closing, he telephoned defendant and asked if he would come up as agreed and close the deal with Lorenzen, to which defendant responded that he would. On the next day, which was February 6,

1909, defendant and Lorenzen both came to town; Lorenzen and wife going to a lawyer's office to wait for defendant in order to close the deal. Plaintiff had seen defendant in a bank, and he phoned him about the matter; but he (defendant) said he did not know that he had anything to do with it; that Barnes had sold the land. Plaintiff then went to the bank, where the following conversation was had:

Miller said, 'Fenton, I didn't know you had the sale of this farm,' to which plaintiff responded: 'Is that so, Mr. Miller? How did that happen?' Miller said: 'Why I don't know. I understood Barnes sold it. You have nothing to do with this deal. This man is Barnes' man. Barnes informs me he has made this deal.' Plaintiff then said: 'Is that so? Let's get Mr. Barnes in.' It took a little time to get Barnes in, and before he got in Miller says, 'I knew, Fenton, you did the work, but I understood you were working for Barnes.' Plaintiff responded: 'Well, Mr. Miller, the day you came into my office I told you I didn't work with anybody, and if you thought I was working with anybody else but myself down there, and when I called you up over the phone, why didn't you say so? 'Oh', he says, 'I didn't know; but now I undestand Barnes claims he has made this sale, and I am not going to pay two commissions.' Plaintiff then said: 'I don't blame you for that.' And I think then Barnes came in, and he claimed to have made the sale, and, of course, Mr. Miller refused to acknowledge me as the man that was making the sale there.

We now quote from the record the following:

Mr. Lorenzen came down, and we talked a little while about the price, as we had not decided on the price, exactly, and I said: 'Well, how about the price, Miller? What do you have to have for that farm?' And he says, '$100 per acre,' and I was looking at Lorenzen, and I says, 'I guess you have got to pay the $100 per acre,' and Mr. Lorenzen walked over to Mr. Miller, and they stepped outside and talked a little, and then Mr. Barnes drew the contract of sale, and I was there, and they wanted to get earnest money, and they didn't have anything, and I said I would go and get the money I had received for the note. It was

a $2,000 note, and I turned that over to Mr. Lorenzen, and they agreed to accept that as a payment on the Miller farm. After the deal was closed up, I saw Mr. Miller, and asked him, and he refused to pay, and said he refused to pay me anything.

Plaintiff further testified as follows regarding the first talk he had with Lorenzen about the defendant's farm:

I got into conversation with Mr. Lorenzen about this place the day we were looking at the Jeffery farm, south of Cleghorn. Lorenzen would buy the Jeffery farm if I could sell his (Lorenzen's) farm before the Jeffery farm was sold. Coming home from the Jeffery farm, one of us mentioned the Miller farm, and he told me Barnes had talked with him about it, and he had been past the place. I think he said he saw Barnes had it advertised, and I told him he had, and we talked about it being advertised by Barnes, and I think he said he had been in the bank and spoken to Barnes, or Barnes spoke to him, I don't know which, and he told me he had been by the place, but I don't remember if he told me he and his wife had been down and looked at the place. My brother was working for me, and I sent him down with Mr. Lorenzen to give him a chance to thoroughly look over the place with the intention of buying it. Q. You knew at the time Mr. Lorenzen had looked over the farm, did you not? A. From what he said to me he hadn't looked over the farm. That makes me think that he did say before that his wife had been with him, and they stopped and looked at the house, I believe. That makes me think, his wife was down with him one time, before we were out to the Jeffery farm. I brought Mr. Lorenzen to Mr. Miller as a buyer for that farm, February 4, 1908, and we talked about it all afternoon and until we left for home towards evening. At that time I had not closed the sale of Lorenzen's farm, and he would not sell unless he could find another farm to buy. That was not the reason, in particular, that I went down to see Miller that day. I wanted to sell Lorenzen's farm, and I wanted to go down and look at it as quick as I could get him to make a deal. In trying to sell Miller's place I was working for Miller.

Another witness testified that he heard the conversation between plaintiff and defendant the day before the defendant's farm was sold, when plaintiff called defendant up and asked if he would stand by the agreement to sell his farm, and that he heard defendant say to plaintiff that he would be up the next day. This is the substance of plaintiff's case as made by the testimony.

Defendant testified that he attempted to list his property with plaintiff, but was unable to do so because plaintiff insisted upon an exclusive agency; that he had already listed the farm with Barnes, and so informed the plaintiff; that upon plaintiff's refusal to accept the proposed agency he had no further talk with plaintiff until he and Lorenzen came to his place, stopped for dinner, and talked in a general way about the farm and the price for the same. He further testified that Barnes sold the farm and that he paid him a commission for making the sale. He further testified that he talked with Lorenzen about the sale before plaintiff brought him down; that he agreed with him (Lorenzen) to meet and arrange about the sale; that the next time he saw Lorenzen plaintiff came with him; that they did not look over the farm, but had considerable conversation regarding terms and price. He admitted having a telephone communication with plaintiff, but denied that he did more than promise to meet plaintiff and Lorenzen the next day. We now quote from the record this further testimony given by defendant:

Q. Don't you know that Mr. Fenton told you over the phone that Mr. Lorenzen would not accept any payment on the purchase price of his farm until he knew that he could buy this? A. No, sir; I understood this condition all the time. I didn't hear that over the phone. I went to town the next day and was asked to come up to Fenton's or Radcliffe's office, I am not sure which. I was doing some banking business with Mr. Barnes at the time, in his bank, and met Fenton there in the lobby of the bank. Q. And the terms and price were talked about at this time,

were they not? A. I think so, most everything was.
Q. And you and Lorenzen finally settled? A. Not there.
Q. Now, who was it, in fact, that made that payment for
Lorenzen—who brought the money or the equivalent of it?
A. I don't know anything about it. Q. Why, you got a
note, didn't you, signed by Charlie Quirin? A. I didn't.
Q. What did you get as earnest money consideration?
A. I got credit in Barnes' bank. I do not know how it
was obtained. Q. You knew Mr. Fenton had an agency
in that matter, didn't you? A. I remember of him coming
there. Q. And Fenton was there part of the time during
the closing up of this? A. No, sir; he was not. Q. You
went back into the private room to make the contract?
A. Yes, sir. Q. Well, wasn't Fenton there all the time
until this contract was signed? A. Well, I think not.
. . . Q. What did you understand Fenton was there
for? A. Well, that is a pretty hard matter to determine.
Now, I will tell you the first thing that entered into my
mind was possibly Mr. Barnes had employed him to come
down with Lorenzen, and then another thing was that he
knew Lorenzen wanted to find and buy this farm, and want-
ed to sell his farm, and in order to sell his farm he wanted
to find out whether he could purchase my farm or not. A
day or two after that I asked Barnes if he had sent him
down there. That was after the deal was made and before
I paid the commission. Fenton was there, and he made
no objection or suggestions. Q. Did you make any in-
quiries why he was there and what he had in it? A. Yes,
sir; I asked Fenton there in the bank what he had to do
with it, and he said this farm of mine could not be sold
without his selling it, without his doing the business. I
says: 'If you own this man, that is a different question;
that is a different proposition.' That is about all that was
said. It was before the contract was made, when we were
all through talking about the contract. . . . Barnes
was never out with Lorenzen, and I am not certain that
Lorenzen and Barnes and I were ever together with refer-
ence to this land until the day we met in the bank. Fenton
had brought the man out and spent half a day with him.
He came in time for dinner, and he called me up over the
phone and wanted to know if I was coming to town the
next day. Q. And the first time that you and Lorenzen

and Barnes ever got together was the day that Mr. Lorenzen bought the farm, after Fenton had brought him out there? A. I think so.

Lorenzen, the purchaser, testified in substance, as follows:

I lived four miles south of Marcus, and the Miller farm was nine miles south of my place. I got my first information that the farm was for sale by seeing it advertised in the paper by Mr. Barnes. After seeing the advertisement, I went into the bank at Marcus and saw Mr. Barnes about it. I asked him where the farm was he had for sale, and he told me, and I said if it was not any further than that I would drive down some day and see it. I drove out and around the farm and looked at it. I didn't find any one at home that day. Then my wife and I went down about a week after that and found Mrs. Miller at home. We drove all over the farm and examined the house, barns, cribs, and everything. Then I saw Mr. Barnes again and told him we had been out there and looked at the farm, and I said the price was a little steep. He said it was a good farm and could not be beat for the improvements and fences, and I told him I knew that it was that way. I went down again alone, and Mr. Miller was at home that day, so I and him we went over the field, but we didn't take no time. The Court: Was that before Fenton had talked to you about it? A. That was before Fenton had anything to do with it. I talked about the price and asked him if that was the lowest, $100, and he said, 'Yes.' After that I was up to Fenton's office one day, and we got to talking about the Miller place, and he said he wouldn't doubt but after a while he would have it, and kind of wanted me to wait until that time. He did not claim to have the place for sale then. He said that if I would wait a while we would drive out and look at it, and, of course, I waited, and pretty soon, it wasn't long, until his brother came and took me out. He claimed he had it for sale. I think that was a little after the 1st of January, but I am not sure about that. When Billy Fenton took me out, there wasn't any one at home, and about a week later Tom Fenton, the plaintiff, took me out. He said he thought he could get it a little cheaper. He thought he could get it

down to about $90; but that didn't work. We saw Mr. Miller, but I didn't buy the farm that day. We talked about the terms, and I don't think we did any more business with Mr. Fenton in regard to that farm. I bought the farm the day Miller came to Marcus. We made the deal at Mr. Barnes' bank. Mr. Barnes was doing the business. Mr. Fenton was there in the bank all the time, but not in the same room. Mr. Miller brought me there to the bank. I had no agreement with Mr. Fenton to go in there to the bank. It was Mr. Barnes who introduced me to this farm and brought about the sale. I heard Mr. Fenton's testimony in regard to bringing $2,000 for me from his office to pay down on this place. That was my property. . . . Q. Now, was there anything said between Mr. Fenton and you about the commission? A. Yes, sir; there was. Q. And what was said? A. Why, Mr. Fenton says, 'I will give you $100 if you will help me out on this deal.' Q. On what deal? A. On that commission, and I said I wouldn't do it. . . . I did not make up my mind to buy the Miller farm when I saw the ad in the paper, nor when I went into the bank to see Mr. Barnes about it. I did not make up my mind to buy it the day I went out alone to see it, nor when I saw Mr. Barnes in regard to the price, nor when I went with Will Fenton to see it. I went out with Tom Fenton in a livery, and we looked at the place and talked about the price and the terms, but I didn't make up my mind that day. The next day I closed up the deal with Mr. Quirin. I am not sure that I asked Mr. Fenton to phone Miller, but I heard him phone. He says, 'Will you be up there tomorrow morning?' And the way Mr. Fenton answered he told him he would, but he didn't come. That was a stormy day. When Fenton told me Miller was coming in, I signed the contract for the sale of my farm to Mr. Quirin. I didn't sign the contract with Quirin just because Tom told me Miller was coming next day, but that was part of it. I came to town next day on purpose to meet Miller, and we closed the deal for his farm. Q. Who sold the farm? A. Why, Mr. Barnes sold the farm; he made the contract. Q. He made the contract and sold you the farm? A. I bought it of Mr. Barnes. I made up my mind to buy the Miller farm the day he came up. After Tom had telephoned, I signed the

Quirin contract for my farm because I wanted to sell, and then I made up my mind to buy the Miller farm. Q. Didn't you tell me that day that you wanted to come here to testify before Miller that Fenton had sold you that farm? A. Well, I might have told you that.

Barnes was also a witness, and the substance of his testimony is as follows:

I was employed by Mr. Miller, November 3, 1908, to sell his farm. Q. What were the terms as given to you, as to the price? A. The price was $100 per acre. Q. What did you do, Mr. Barnes, with relation to making the sale of the farm? A. I immediately put an ad in the Marcus News that I had the farm for sale. In about two weeks Mr. Lorenzen came in and saw me about it and asked about the terms, and I told him about it, and he said he would go and see the farm. I told him I could not very well go out, but for him to go and look the farm over with Mr. Miller, and if the farm suited him we would try and make a deal. He said he had to sell his farm, and if he could sell it he would look this farm over and come again. He came back in a few days and said he had been out, but was going again, and would take his wife with him. After he had done that, he came in, said they had been to see the farm, and looked it all over, and had looked at the buildings, but he hadn't yet made up his mind whether he would have it. We talked the matter over and talked about the advantages of the farm and how it was fenced and about the buildings and improvements, and I endeavored to sell him the place. I saw him several times after that. Whenever he came into the bank we talked it over. I think three or four times during the winter. I told Mr. Miller what I had done, and that later, if he sold his farm, I would be able to make the deal at $100 per acre. I knew Lorenzen had to sell before he could buy. I could not say whether we talked again after that before the consummation of the deal on the 6th day of February, 1908. At that time I was in the bank, and Mr. Miller came in, and, after waiting a while, Mr. Lorenzen came in, and the three of us talked it over. Later, Mr. Fenton came in, and it was after he came in that the contract for the sale of the farm was made. Before Mr. Fenton came in, we had agreed up-

on the sale of the farm at $100 per acre, and we talked over how the payments should be made. Mr. Lorenzen had to make some arrangements about a part of the money. I don't know what motive prompted Fenton to be there. I don't know as any of us sent for him. After Mr. Lorenzen, Mr. Miller, and myself had agreed on the price and the terms, I proceeded to draw up a contract. At the time I drew the contract, Mr. Fenton was in the back office, and I drew the contract in the front banking room, at the counter, and Lorenzen and Miller stood by me. After it was drawn, Mr. Miller, Mr. Lorenzen, and Mrs. Lorenzen signed it there. I think Fenton was in the back office when the contract was signed. Mr. Fenton told Mr. Miller that he claimed a commission for selling the farm, and Mr. Miller said he didn't sell the farm, and he didn't owe him any commission, and that he hadn't the agency of selling the farm. After the contract was made, I received a commission from Mr. Miller for selling the farm. . . . I did not take Lorenzen to see the place. I knew when we made the contract that Fenton had had him out once. I did not know Lorenzen had refused to sell his farm until he was sure he could buy Miller's, and I didn't know that he had closed the deal for the sale of his own farm to Quirin the day before. I found it out that day when I bought the $2,000 note Quirin had paid to Lorenzen on his farm. I learned that before any commission was paid to me. Q. Now, Mr. Fenton was there assisting in the talking about negotiations in the bank there? A. Yes, sir. Q. Did you have anything to say about closing the deal or the price, or did Lorenzen and Miller settle that themselves? A. I had something to say about it. Q. And so did Fenton? A. No, sir; he did not. Q. You weren't in the office? A. He may have, not in my presence. I knew Fenton had him out there the day before or a few days before. I don't know when he had him out. At that time I didn't know he had ever been out with him. I heard it was his brother. I don't remember that Miller ever phoned to me that they had been out, and I do not remember having any talk with Lorenzen about it after they had been out there. I could not say when I first learned that Fenton had Lorenzen out to that farm. I first learned that Lorenzen had made up his mind to take the farm the day we closed the

deal. I don't remember that he had ever agreed to take the farm or told me that he had prior to that time.

Upon this testimony the case was submitted to the jury, with the following relevant instructions:

(4) You are instructed, as a matter of law, that in cases of this character, to entitle a real estate broker to recover a commission for procuring a purchaser for the lands of another, there must be a contract of employment between himself and the owner, whereby the owner employs and promises and agrees to pay the broker a commission for such services. And it must also be shown that it was through the efforts and inducements exerted by the broker that the purchaser and the owner were brought together, and induced to enter into and continue the negotiations which finally culminated in the purchase.

And where the owner has listed the land under such a contract with two real estate brokers, both of whom work upon and use their efforts to secure the customer who makes the purchase, that one only will be entitled to the commission whose efforts and persuasions were the main and moving cause of inducing the customer to meet with the owner and take up the negotiations which finally culminated in the sale. And where the owner and purchaser have already been brought together and are in the course of negotiations through the efforts of one broker, and thereafter the other broker takes up the matter, and attempts to procure the purchaser as a customer for himself, the latter will not be entitled to a commission for his services, unless it appears that the negotiations induced through the efforts of the first broker have been broken off or abandoned, so that the efforts of the first are not the principal and moving cause by which the purchaser was induced to again take up or renew the negotiations and complete the purchase, and that the efforts and persuasion of the latter were the principal and moving cause of bringing the parties together again, and taking up the negotiations which finally resulted in the sale.

(5) If you should find from the preponderance of the evidence that on or about the 15th day of September, 1908, the defendant listed the tract of land in question with the plaintiff, and then and there orally promised and agreed

to pay the plaintiff a commission of $1 per acre, in case he should succeed in finding and procuring a person to purchase the same at a price and upon terms satisfactory to the defendant, or that in substance, and you further find from a preponderance of the evidence that thereafter the plaintiff, in pursuance of said contract of employment, found and procured one Lorenzen as a purchaser for said land, and that the efforts and persuasion of the plaintiff were the main and moving cause which brought the parties together and induced the said Lorenzen to enter into negotiations and make said purchase, then the plaintiff will be entitled to recover in this action, and your verdict will be in his favor.

If you do not so find, or if you believe from the evidence that there was no contract of employment between the parties whereby the defendant listed his land with the plaintiff and promised and agreed to pay him a commission of $1 per acre in case he should succeed in finding and procuring a customer, or that in substance, or if the efforts of the plaintiff, if any expended by him upon the said Lorenzen, were not the main and moving cause which brought the parties together, and induced the said Lorenzen to enter into or continue the negotiations and complete the purchase, as hereinbefore stated and explained, then the plaintiff can not recover anything in this action, and your verdict will be for the defendant.

In view of the contentions made for appellant, it has seemed necessary to quote from the record even at the expense of brevity; for the principal point made is that there should have been a verdict for the defendant under the testimony adduced.

The only instruction which is challenged is the fourth, being the one first quoted, and the argument against it is that there was no such testimony of Barnes' abandonment of the negotiations with Lorenzen, and of plaintiff's thereafter taking the matter up, as to justify its injection into the case. The record is not such as to lead us to this view. True, there was no direct testimony of any abandonment

1. Brokers: sale of land on commission: compensation: evidence.

by Barnes of the negotiations begun by him; but a jury was justified in inferring that Lorenzen ceased his negotiations with Barnes and took the matter up with plaintiff Fenton. Plaintiff was not bound to show that Barnes consented to an abandonment of his negotiations with the purchaser. All that he needed to do in this connection was to show that he was the efficient, the procuring, cause of the sale, and that it was, through his efforts that the sale was finally consummated. No formal showing of an abandonment was necessary. It could be inferred from the conduct of the parties, and there was, as we think, enough in the testimony to take that question to the jury. The instruction is not erroneous.

The close question in the case is this: Was there enough testimony in the record to take the case to the jury upon the issue as to plaintiff's efforts being the ef-

2. SAME: effi- ficient and procuring cause of the sale? It
cient and pro-
curing cause: is true the purchaser testified that he recog-
evidence.
nized Barnes as the agent and purchased through him; but this testimony is not conclusive. All the evidence offered should be considered in settling this issue, and if the direct testimony be conflicting, or if the inferences to be drawn therefrom be such that reasonable minds might honestly differ in their conclusions as to whose efforts really brought about the sale, the question was for the jury, under proper instructions. Recurring again to the testimony, it will be observed that, notwithstanding defendant's denial, a jury may well have found that he listed his land with both plaintiff and Barnes; that each of the agents spoke to Lorenzen about the land, although Barnes was the first one to mention it to him; that each induced him to go and look over the land, although plaintiff is the only agent who went with him; that each knew the other was trying to sell the land to Lorenzen; and that each talked over the price and urged him to buy. It is apparent, also, that plaintiff had an advantage over Barnes, in that Lorenzen

was in no position to buy, and distinctly stated that he would not unless plaintiff sold his (Lorenzen's) land. It is also true that Lorenzen first learned of defendant's land through the advertisement of Barnes, and that plaintiff was trying to sell him another piece; but a jury may have found that, although Lorenzen first learned of the land through Barnes, and talked with him about·it, he abandoned his negotiations with Barnes and took the matter up with plaintiff. Plaintiff was the first one to bring Lorenzen and defendant together, and, while they did not then close the deal, defendant promised to take the matter up the next day, which he did, and Lorenzen would not even then agree to sell his own land until plaintiff had defendant's promise to sell to Lorenzen. Obtaining that promise, he sold Lorenzen's land, and the next day the deal with defendant was closed. Assuming as we must, that plaintiff had an agency for the sale of defendant's land, it was a fair question for the jury to decide whether or not it was through plaintiff's efforts that the parties were brought together and induced to close the deal. The instructions given made the law of the case, save as they are complained of by defendant, and the complaints lodged against them are without merit. We have no occasion therefore to discuss the legal propositions involved or to make any reference to the authorities cited by counsel.

Ordinarily, the question as to whether or not a broker's efforts are the efficient and procuring cause of a sale is one of fact for a jury. *Hanna v. Collins,* 69 Iowa, 51. And it follows that where two or more agents have the property listed, and each does something toward effecting a sale, the question as to which one's efforts induced it is also for a jury.

Of course, both are not entitled to a commission, and under our system, it is generally a question for a jury to determine which one is of right entitled to it. Defendant should not have paid either agent, but have brought them

both into court, leaving the matter of which one was en-
titled to the commission to a jury. By rea-
son of his failure to do so he may have to
pay both. The case is close in its facts; but
the testimony is not so clearly against the verdict as to
justify us in setting it aside. In support of our views we
quote the following from *Higgins v. Miller*, 109 Ky. 209,
(58 S. W. 580): "Our opinion is that, when property has
been listed for sale with a number of real estate agents,
the one who succeeds in bringing the seller and purchaser
together, and induces them to enter into the contract, is
the one who has earned the commission; and this is true,
regardless of the question as to who first introduced the
seller and purchaser. In *Vreeland v. Vetterlein*, 33 N. J.
Law, 247, the court had under consideration the question
of commission where a number of real estate brokers were
endeavoring to consummate a sale. The court said: 'Now,
in this competition, the vendor of the property is to remain
neutral. He is interested only in the result. But when
either of the agents thus employed brings a purchaser to
him, and a bargain is struck at the required price, on what
ground can he refuse to complete the bargain? Can he
say to the successful competitor, This purchaser was first
approached by your rival, and you should have refused to
treat with him on the subject?' There is no legal prin-
ciple upon which such a position could rest. It is contrary
to the usages of everyday commerce. Every advertisement
of a stock of goods for sale has a tendency to carry off the
customers of rival dealers. And if, therefore, it should be
known to the vendor of the property that the agent, who
introduces a purchaser to him, has, by the usual arts of
competition, taken such purchaser out of the hands of his
rival, I am not aware of anything in the law which would
justify such vendor in a refusal to complete the contract.'"
See, also, in support of the same doctrine, *Gilbert v. Mc-
Cullough*, 146 Iowa, 335; *Edwards v. Pike*, 49 Tex. Civ.

3. SAME: com-
pensation:
conflicting
claims.

App. 30, (107 S. W. 586); *Dalke v. Singer,* 56 Wash. 462, (105 Pac. 1031, 27 L. R. A. (N. S.) 195); *Jarvis v. Schaefer,* 105 N. Y. 289, (11 N. E. 634); *Scott v. Lloyd,* 19 Colo. 401, (35 Pac. 733).

No prejudicial error appears, and the judgment must be, and it is, *affirmed.*

WEAVER and EVANS, JJ., dissenting.