C. L. McFarland, Appellee, v. J. H. Howell and William B. Cline, Appellants.

**Agency:** COMMISSION FOR SALE OF LAND: RIGHT OF RECOVERY: EVIDENCE. Where plaintiff, employed to sell land, knew that it was listed for sale with other agents, and before closing a sale to his purchaser he also knew that another agent had closed a sale with another purchaser, and that the owner being first informed of the sale by the other agent had signed a contract before he was informed of the sale made by plaintiff, he was not entitled to his commission.

**Same:** COMPLIANCE WITH TERMS OF SALE. An agent authorized to sell land for a stated cash payment on execution of the contract, does not comply with the contract by accepting a check for the cash payment, which was payable to a third person and could not therefore be cashed either by him or his principal alone.

**Administrators:** CONTRACTS: PERSONAL LIABILITY. An administrator is not authorized by statute to employ an agent to sell land belonging to the estate, and therefore cannot bind the estate for commissions paid, but is personally liable therefor.

*Appeal from Wright District Court.*—HON. C. G. LEE, Judge.

THURSDAY, NOVEMBER 13, 1913.

ACTION by a real estate broker to recover a commission for sale of real estate. From a judgment in favor of plaintiff the defendants appeal.—*Reversed.*

*Sylvester Flynn,* for appellants.

*Birdsall & Birdsall,* for appellee.

WITHROW, J.—The plaintiff, C. L. McFarland, claims recovery in this action under an oral contract between himself and the defendants, by which, as alleged by him in his petition, he was to find a purchaser for the southeast quarter of section 10, township 91, Wright county, at $95 per acre, $1,000 to be paid in cash, and balance to be paid when the contract should be closed by execution of deed of conveyance, and for which plaintiff was to receive $1 per acre. He avers that he did find purchasers, Rasmussen and Jepson, who agreed to take the land upon the terms named, and that they were able, ready, and willing to buy on the terms proposed, by reasons of which facts the plaintiff alleges he became entitled to a commission of $160. The defendants pleaded that the real estate in question belonged to the estate of William Cline, of which they were the executors, and that it was, on

behalf of the estate, listed with several real estate agents at
the price of $15,200, of which $1,000 should be paid in cash
upon execution of the contract, the balance of the purchase
price to be paid in cash upon execution and delivery of a
deed of the executors, authorized and approved by the court,
together with an abstract showing good, merchantable title,
and that the fact of listing with other agents was known
to plaintiff; that they made no contract with the plaintiff
in their individual capacity, and plaintiff well knew that
they were acting only as executors. They further say that
a contract of sale of said real estate was made by them as
executors with a purchaser produced by another agent, and
that such was before the plaintiff found his pretended pur-
chaser, and that by such binding contract of sale being
entered into the agency of plaintiff terminated. No reply
was filed. The cause was tried to the court, and a judg-
ment for $160 and costs was rendered against the defendants,
as individuals, and they appeal.

I. The contract pleaded by the plaintiff was that he
was to find a purchaser ready and willing to buy the lands
at the price and terms fixed. His testimony was that he was

1. AGENCY: com-
mission for
sale of land:
right of recov-
ery: evidence.

to have the commission if he found the buyer
and made the sale. The latter provision varies
in form of expression from that pleaded as the
agreement, and we accept it as the basis upon
which his right must rest; and this must be considered in con-
nection with the clearly established fact that he knew that
other agents were also authorized to find purchasers, and that
if, prior to his finding a purchaser, another agent had secured
an offer to purchase, which was accepted by the owner,
the agreement with McFarland would then be terminated.
*Fenton v. Miller*, 153 Iowa, 747-762.

We turn to the facts upon this proposition. The appellee,
McFarland, with whom the land was listed, had first without
success endeavored to effect a contract of sale with one Fred
Rasmussen. Afterwards, as claimed by him, he did enter

into an agreement with Metz H. Rasmussen and John Jepson, which was at the time reduced to writing, signed by the intending purchasers, and Rasmussen's check for $1,000 was then handed to McFarland as first payment under the contract. Neither of the appellants was present at the time, nor had knowledge of the transaction until it was subsequently communicated to them by McFarland, and the contract was not signed by them. This transaction is claimed to have occurred between 11 and 12 o'clock, in the forenoon of March 25th. McFarland, after the instrument was signed and the check delivered to him, telephoned Mr. Howell, one of the appellants, who was at Eagle Grove, stating that he had sold the Cline farm and would send the contract down. He did not then communicate with Mr. Cline, the other appellant. McFarland's testimony as to the talk with Howell was as follows: That after he had told him he had sold the farm, Howell said, "Is that so," to which McFarland answer, "Yes, I sold it; the contract is signed and the money paid down," to which Howell said, "All right." McFarland said he would send the contract to Howell for his signature, to which the latter replied, "All right." The contract was not sent to Howell, but to Cline, who resided in another town, and immediately upon its receipt Cline remailed it to McFarland, with the written indorsement, 'You are too late, as I was notified it was sold before you wrote me and Howell wrote me he had signed contract for sale to another purchaser." The purchaser with whom the contract was actually made was secured by one Uhr, another broker with whom the land had been listed.

On March 23d Howell was informed that Uhr had found a purchaser for the land, one Blackwell, and that the purchaser would come to sign the contract on Monday, the 25th. On the morning of that day one Lynch, who was interested in the McFarland deal, called upon Howell at the bank, and said he had a buyer for the Cline land. Lynch was invited into the back room by Howell, with the statement that Uhr was there

and had a purchaser. Lynch declined to meet Uhr, but asked if he could not make a deal with Howell, and was informed that he, Lynch, must speak to Uhr. He did not, but left the bank. At this time Lynch was acting either for McFarland, in the expectation of dividing the commission with him, or for Rasmussen and Jepson, to secure a division of the commission with McFarland for their benefit. It was after this conversation at the bank with Lynch that Howell was called to the telephone by McFarland, who was at Goldfield, and informed of the contract with Rasmussen and Jepson. A written contract of sale was entered into between Blackwell and Howell on March 25th, at 4 o'clock p. m., and signed by Cline on the following day. The record discloses that there had been a spirited race between rival brokers to secure the commission, and also that McFarland and Uhr had earlier been informed by Howell that he and Cline would not pay two commissions, it having appeared that the two brokers claimed to have secured Fred Rasmussen as a purchaser. That deal was not carried through; but the rivalry then existing was yet active, and found expression in the subsequent conduct of the parties in the deal in question. In the view we take of the case it is unnecessary to go more fully into a statement of the evidence. From that which has been given it is without fair doubt that the preparation and signing of the Rasmussen-Jepson contract was after Lynch had been advised of the agreement with Blackwell, and was aimed to meet a crisis which would involve McFarland's commission. The testimony of Lynch was that he talked with McFarland after his talk with Howell, and with his interest in the deal, and with the knowledge that if the Blackwell deal was closed his commission dividing or sharing plan would be of no value, it is not an unreasonable conclusion that McFarland's activities were prompted by information received over the telephone as to the Blackwell transaction. Whatever may have been the transaction between McFarland and Rasmussen and Jepson, it must have come within the requirements of McFar-

land's authority, and have been in time before it would become binding upon Howell and Cline. It is significant that the agreement was sent to Cline and not to Howell for signature, in the light of the knowledge by Howell and possible want of knowledge by Cline of the Blackwell transaction. It received the confirmation of neither, unless it may be held that Howell's statement of "All right," when advised of the McFarland transaction, may be so construed, but this, with the explanation made by him, must be considered in the light of then existing facts. The Rasmussen-Jepson alleged contract bore only their signatures. McFarland did not assume to bind his principals by signing it for them, but sent it for their approval. This it did not receive, but was rejected by both because of the prior contract, for before the time of the receipt by Cline of the McFarland contract for signature, the Uhr contract had been signed by Howell.

We also must conclude from the evidence that at and before the time it is alleged the deal was closed with Jepson and Rasmussen, McFarland knew of the transaction with Blackwell, which, if not fully completed by the indorsement of both parties by completed written contract, had progressed as far as did the McFarland deal, and was prior in point of time, and with such knowledge the appellee was bound to know that his agency had been revoked. There does not appear to have been any bad faith on the part of Howell and Cline. They knew of the activity of the different agents, and were seeking, among other things, to avoid liability for more than one commission; and in first formally accepting the Uhr purchaser, and in contracting with him, we must hold under this record that they did not become liable to McFarland.

II. But there is another view under the evidence which is equally controlling against the appellee. The check for $1,000 given by Rasmussen was made payable to the Farmers'

2. SAME: compliance with terms of sale.

Savings Bank or order, and was drawn on the same bank. Rasmussen testified that it was good, although he did not know if he then had that amount in his credit in the bank. But aside from

that, instead of being made payable to others, it must have been drawn in favor of Howell or Cline, or both, or, giving the most liberal construction to the claim of McFarland, to him as agent for them before it could have been a payment as earnest money. It was not cash, although so stated to be by McFarland over the telephone; nor was it in such form that any of the parties for whom it was intended, if it was in fact given as payment, could by their own indorsement alone have realized upon it. There was required the indorsement of one who was a stranger to the transaction, in no privity with any of its parties; and the burden of securing such could not be imposed upon the person to whom it was delivered as payment, without his assent. But beyond this appears in the testimony of McFarland the statement: "I never got it cashed; I could not cash that one," referring to the check. The general rule is that when a check is received by the creditor there is no presumption that he takes it in payment, but, on the contrary, the implication is that it is only to be regarded as payment when cashed. 2 Daniel, Neg. Inst. Section 1623; *Dille v. White*, 132 Iowa, 327. To this rule there is the qualification that the creditor may, if he pleases, accept it as payment, it being a question of fact as to the intent of the parties. McFarland's authority was to receive cash. He accepted an instrument upon which he said he could not draw the money. It, therefore, was not a payment in cash. His right to recovery were the sale upon which he relies made prior to the Blackwell contract, was necessarily based upon a strict compliance with the terms and conditions of sale, unless there was a waiver by the owners, and without authority from his principals the delivery of the check to him was not a cash payment. *Knudson v. Laurent*, 159 Iowa, 189; *Ormsby v. Graham*, 123 Iowa, 202-218. We are of opinion that in this respect there was a failure on the part of McFarland to comply with the terms of the contract under which he claims, and that in holding the plaintiff entitled to recover the trial court committed error.

III. The contention of the appellants that they could not be held personally liable on the contract in suit, should there be a right of recovery, cannot be upheld. The general

3. ADMINISTRA- rule is that contracts of an executor or admin-
TORS: con-
tracts: per- istrator, although made in the interest and for
sonal liability. the benefit of the estate, if made upon a new
and independent consideration moving to the representative of the estate, are personal obligations, and do not bind the estate. 18 Cyc. 247.

This court has held in *Valley National Bank v. Crosby,* 108 Iowa, 653, that an administrator, in the absence of statutory authority, cannot bind the estate by his personal contracts. The primary liability, in instances like the present one, is upon the persons creating the obligation, in their individual capacity, although the probate court may, upon proper showing that the expenditure was for the interest of the estate, allow the claim as a personal one of the executor or administrator. There is no provision of the statute authorizing expenditures such as here claimed, and the case falls within the rule stated.

We need not give attention to other errors asigned by the appellants. The result which we have reached as to the finding of the trial court is conclusive of the case. The judgment is *Reversed.*

WEAVER, C. J., and DEEMER and GAYNOR, JJ., concur.